**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1793**

LAWRENCE P. MANN; LINDA S. MANN,

Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge. (8:17-cv-00200-TDC)

Argued: October 28, 2020                    Decided: January 6, 2021

Before NIEMEYER, MOTZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Motz and Judge Richardson joined.

**ARGUED:** Joshua J. Gayfield, MILES & STOCKBRIDGE P.C., Baltimore, Maryland, for Appellants. Douglas Campbell Rennie, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Derek P. Roussillon, Annie M. McGuire, MILES & STOCKBRIDGE P.C., Baltimore, Maryland; Lawrence J. Anderson, NEALON & ASSOCIATES, P.C., Alexandria, Virginia, for Appellants. Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Teresa E. McLaughlin, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

NIEMEYER, Circuit Judge:

In this appeal, Linda and Lawrence Mann challenge the district court's judgment affirming the IRS's disallowance of a charitable deduction that they claimed on their 2011 joint income tax return.

After Linda Mann purchased real property in Bethesda, Maryland, known as 5300 Moorland Lane, she and her husband decided to tear down the existing house on that property and build a new one in its place. In an agreement with Second Chance, a charitable organization, the Manns stated that they were donating the existing house in its entirety to Second Chance, but not the underlying land, and then took a charitable deduction of $675,000 on their income tax return, representing the appraised value of the house as if it were moved intact to another lot. Second Chance, however, disassembled some of the house, salvaged useful components, and left the remainder for demolition by the Manns' contractor.

The IRS disallowed the deduction on the ground that the Manns did not convey their entire interest in the house, as required by 26 U.S.C. § 170(f)(3), and failed to provide an accurate appraisal of what they actually did donate. The IRS also rejected the Manns' effort to amend the claimed deduction to $313,353 for settlement purposes, based on an alternative appraisal of the house's value.

The Manns paid the additional taxes assessed by the IRS and commenced this action against the United States, seeking a refund of approximately $213,000. They claimed that, through their agreement with Second Chance, they conveyed the entire house to Second Chance and therefore their appraisals of the entire house were appropriate. On the parties'

2

cross-motions for summary judgment, the district court upheld the IRS's determination that the Manns were not entitled to a charitable deduction for the value of the house, reasoning that they had not donated their entire interest in the property under Maryland law; that, considered practically, the Manns also did not donate all the components of the house itself, as some were destroyed and some were retained for demolition; and that the alternative appraisal of $313,353, which valued all of the house's components, overstated the value of their donation.

For the reasons that follow, we affirm.

I

After Linda and Lawrence Mann received an unsolicited offer to purchase their house in Bethesda, Maryland — a house in which they had lived for nearly 20 years — they decided to accept the offer and downsize to a smaller house in the same neighborhood. They found one at 5300 Moorland Lane and, in April 2011, purchased it for $2,250,000. They purchased it in Linda's name in order to effect a better division of the couple's assets. The house at 5300 Moorland Lane was a remodeled colonial house in good condition, which the Manns planned to renovate. But after discovering water issues in the basement and learning from their architect the high cost of desired changes to the house's layout, they decided to tear down the existing house and build a new one in its place. Accordingly, they hired a building contractor to demolish the existing house, clear the site, and build a new house.

Other builders whom the Manns knew suggested that the Manns consider working with Second Chance, a charitable organization offering "deconstruction" services, and thereby not only further the organization's noble mission but also obtain a tax deduction in the process. Second Chance is a § 501(c)(3) charitable organization based in Baltimore, Maryland, that offers deconstruction services to further its mission of providing "workforce development and job training opportunities to disadvantaged members of the community" who carry out the deconstruction, while also preventing "salvageable building materials and fixtures from [ending up in] landfills." The participants in the deconstruction program are employees who are paid an hourly wage and learn construction skills. Second Chance's deconstruction work involves the "systemic dismantling of a structure" to remove some building components "for preservation and salvage." Other components, like drywall, tile, and roofing materials, are necessarily destroyed as part of the deconstruction process, and yet others are destroyed as part of the employees' training. Second Chance emphasizes, however, that it does not "provide demolition services," and it advises deconstruction donors that they "must engage a demolition contractor at their own expense." The charity "owns and operates a warehouse and retail store . . . from which it resells furniture, fixtures, and building materials" that it has recovered through deconstruction or that people have otherwise donated.

Second Chance asks individuals donating property for deconstruction to also make a cash contribution to help defray the costs of its training program — mainly the hourly wages of the program's participants. It rarely undertakes a deconstruction project that lacks such funding, doing so only when the materials to be salvaged have historical significance.

4

After learning about Second Chance, the Manns decided to have the charity deconstruct their house before it was demolished by their contractor. To this end, Linda Mann, as the owner of the house, signed a two-page "Agreement for Charitable Contribution" with Second Chance, dated December 1, 2011. The agreement provided that inasmuch as Second Chance "utilizes existing homes . . . to provide building materials for reuse and for work-force training" and inasmuch as Linda wished to "contribute to Second Chance the existing single-family residential dwelling" at 5300 Moorland Lane for the "purpose of Second Chance using the Premises in its charitable operations," Linda conveyed to Second Chance "all of [her] right, title and interest in the improvements, building and fixtures located [at 5300 Moorland Lane]," as described in an appraisal "prepared by Novastar Appraisal, Inc." The agreement also provided that Second Chance was to provide the labor, materials, and tools required to "undertake and complete . . . the removal of the [building] in accordance with its customary procedures." Finally, in addition to other administrative provisions, Second Chance agreed to "cooperate with [Linda] in coordinating the documentation to evidence the charitable contribution to Second Chance" in connection with the Manns' "federal and state income tax returns."

A couple of days before Second Chance began deconstruction in late December 2011, a Second Chance Deconstruction Sales Manager explained to Lawrence Mann how the tax deduction for the donation would work.

> You should of course discuss this with your CPA, but I can confidently say that a "contents" donation is as solid as it gets. Although no nonprofit can offer a guarantee, I'm sure your CPA will agree that an inventoried materials donation is equivalent to donating and deducting the value of your front door, or couch (as with your personal property donation). *The approach we're*

5

*discussing only considers the value of what crosses the threshold of our warehouse, based on a manifest that we sign to verify receipt. . . .* [I]f the donor follows the IRS code for deducting the fair market value based on a qualified appraisal done by a qualified appraiser, there is no reason a donor should not receive the deduction.

You and your CPA have a couple [of] options to arrive at that manifest based deduction . . . . Either way we will provide a manifest list of what we actually take away from the site. We fully expect this manifest list will carry a value north of 200k, but a conservative minimum would be 150k — creating tax savings of at least 45k, of which 20k you would pledge to Second Chance, leaving at least 25–30k in your pocket at the end of the process.

(Emphasis added). Thus, based on the expected level of tax savings for the Manns, Second Chance asked them to make a cash donation of $20,000 to help it offset the cost of paying its trainees. Lawrence initially wanted to condition this payment on the IRS's acceptance of the deduction, but ultimately, he sent Second Chance a check for $10,000 on December 31, 2011, "to cover de-construction so far." And in 2012, when Second Chance requested the second $10,000 payment of the total $20,000 proposed donation, Lawrence sent Second Chance $1,500.

In advance of the deconstruction, the Manns engaged NoVaStar Appraisals, Inc., to provide an appraisal establishing the value of the donation for tax purposes. Accordingly, in mid-October 2011, a NoVaStar appraiser inspected and appraised both the house and personal property in the house that was being donated.

The appraiser concluded, as stated in the appraisal, that the "Highest and Best use" of the house was "not disassembly, but rather physically moving the structure to another lot" to function as a residence. The appraisal added that "disassembly destroys part of the structure during the process, such as: drywall, tile and roofing materials. Deconstruction

6

therefore is not considered Highest and Best use." The appraiser accordingly assessed the value of the house "without disassembly." To establish this value, the appraiser first established the value of the property at 5300 Moorland Lane as Linda actually purchased it, concluding that its fair market value was $1,875,000. He then assessed the "value of the land only," assuming that "the structure [did] not exist" on the property and concluded that the land alone had a market value of $1,200,000. Subtracting the land value from the total property value, the appraiser concluded that the value of the intact house without land was $675,000. The Manns used this appraisal when they claimed a tax deduction for donating the house to Second Chance.

Second Chance began the first phase of deconstruction — which involved the removal of non-structural interior elements — on December 22, 2011. After it finished this phase in January 2012, it had to wait to begin the second phase of deconstructing exterior and structural elements until the Manns' contractor had obtained a demolition permit. After the permit was obtained in June 2012, Second Chance began the second phase of deconstruction and completed its work on July 6. That morning, a Second Chance project manager sent Lawrence an email stating that "[t]he materials and appliances that [Second Chance had] extracted were excellent," but that it had not been "able to extract as much as we had hoped to" because the Manns' "demo contractor [had] started his work sooner than we anticipated." Lawrence followed up with his contractor about what had happened, noting that he "didn't want the IRS to hear that 'we were not able to extract as much as we had hoped.'" The contractor responded that it had been "doing quite a bit of waiting around for Second Chance to do their work" to the extent that their demolition

7

subcontractor had therefore agreed "to help with the deconstruction." According to the contractor, Second Chance had been present the day before (July 5) but had left after a few hours even though "[m]aterials [were] still available on site to salvage." Second Chance thus ended its deconstruction on July 6, and the Manns' contractor thereafter demolished the house and removed the remaining structural elements.

Second Chance did not maintain a complete inventory of the items that it removed from the 5300 Moorland Lane house during the deconstruction, although it did create a list of items that it took from the house during the first phase of the project, which included appliances, granite counter tops, solid wood interior doors, and 2400 square feet of wood flooring. In addition, the Manns prepared a list of 40 items of personal property — furniture and home decorations — that they donated to Second Chance, which they valued at $24,206, based on the NoVaStar appraisal.

On their joint federal income tax return for 2011, the Manns claimed a deduction of $675,000 for the house, relying on the appraisal provided by NoVaStar Appraisals; a deduction of $24,206 for the personal property they had donated; and a deduction of $10,000 for their cash donation. On their tax return for 2012, they claimed as a deduction the $1,500 cash donation they made to Second Chance in 2012.

The IRS subsequently selected the Manns' 2011 and 2012 tax returns for an audit and determined that the deductions for their donations to Second Chance should be disallowed. After the Manns' administrative appeal was denied, the IRS calculated their tax liability and determined that the Manns owed $191,638 in federal income taxes for 2011 and $2,464 for 2012, plus statutory interest. The Manns paid those taxes, and in

November 2015 filed a claim for a refund and a request for abatement. In addition, in August 2016, the Manns filed an amended return for 2011 that, "for settlement purposes only," adjusted the claimed deduction for the house from $675,000 to $313,353, based on an alternative appraisal by NoVaStar Appraisals.

This second appraisal determined the fair market value of the house based on the value of the "structure's used building components when sold on the 2nd hand market." To justify this approach, the appraisal explained that Second Chance "uses the entire building structure in its Workforce Development Program" and that the donation was therefore "similar to donating a structure to the local fire department for use in a fire training exercise." "Due to the lack of a well established second hand market for all" of the house's building materials, the appraisal used "the cost approach to value" by estimating the cost of all materials as new and then accounting for depreciation. Using the R.S. Means Building Material Cost Estimating Software, the appraisal calculated the cost of all materials when new to be $377,534. It then "depreciated" the value of those materials by 17%, based on an estimated "60 years of economic life with an effective age of 10," arriving at a market value for the building components of $313,353. This appraisal thus provided an estimate of *all of the house's building components* without regard to (1) which components would be removed by Second Chance for resale; (2) which would be destroyed during the course of deconstruction; and (3) which would remain on site for demolition and removal by the Manns' contractor.

On review of the Manns' amended return, the IRS again disallowed the claimed deduction.

9

The Manns commenced this action against the United States in January 2017, seeking a determination that their original claimed deductions were valid and a refund of $212,534.22. After discovery, the parties filed cross-motions for summary judgment.

In a memorandum opinion dated January 31, 2019, the district court granted the IRS summary judgment with respect to its disallowance of the deduction for the house, setting forth two separate grounds. *See Mann v. United States*, 364 F. Supp. 3d 553, 561–64 (D. Md. 2019). *First*, the court concluded that the Manns "failed to make a valid transfer of an *entire interest* in real property," as required by 26 U.S.C. § 170(f)(3) for claiming the deduction. *Id*. at 562 (emphasis added). It concluded that "the Manns [did] not properly sever[] the House from the Property" because the Manns never recorded the transfer of the house in the county land records, as required under Maryland law. *Id*. The court thus reasoned that "the Manns' donation was comparable to granting a license to Second Chance to access and use the House for salvage and training purposes." *Id*.

*Second*, the court concluded that "[e]ven if . . . the Manns had properly severed" their interest in the house from their interest in real property and had effectively donated the house to Second Chance, the Manns would still not be entitled to a deduction of $675,000, as first claimed, or to a deduction of $313,353, as claimed in their amended return, because the appraisals to justify those deductions were not "qualified appraisal[s] that properly substantiated the Manns' claimed deductions." *Mann*, 364 F. Supp. 3d at 563–64. Specifically, the court noted that the second appraisal was "not consistent with the condition on the conveyance that the [h]ouse would be used for Second Chance's [training] program," through which parts of the house would be destroyed, not salvaged

10

and resold. *Id*. at 564. Because "the conditions of Second Chance's training program necessarily prevented all [building] materials from being salvaged, [a] valuation based on the resale value of all building materials overstated the value of the [h]ouse." *Id*. The court explained that "the proper way to calculate a tax deduction from this donation" would have been "based on the resale value of the specific building materials and contents" that Second Chance *actually removed* from the house in order to resell them. *Id*. The court accordingly concluded that the Manns' failure to provide "a qualified appraisal that properly substantiated [their] claimed deductions" provided an alternative ground for entering judgment for the United States with respect to the house donation. *Id*.

With respect to the Manns' claimed deduction for their donation of personal property, the court concluded similarly that the "appraisal supporting the donation [was] deficient in several respects." *Mann*, 364 F. Supp. 3d at 564. And with respect to the cash donations, the court granted summary judgment to the Manns, concluding that the cash donations were properly deductible. *Id*. at 565–68.

After the district court denied the Manns' motion to alter or amend the judgment, the Manns filed this appeal, challenging only the district court's ruling in upholding the government's disallowance of their amended claimed deduction in the amount of $313,353 for the value of the house.

II

In maintaining that they were entitled to the $313,353 deduction — which represented the aggregate value of all of the house's components — the Manns contend

11

that (1) they effectively severed the house from the real property by their written donation agreement; (2) they donated their *entire interest* in the house to Second Chance; and (3) the value of the house so donated was properly appraised in the $313,353 appraisal. They argue that their donation agreement "constructively" severed the house from the underlying land and that, under Maryland law, severance does not require recordation of the transfer, contrary to the finding of the district court. Moreover, they assert, because they donated the house "in its entirety to Second Chance," it was appropriate for the appraisal to determine the value of "*all* of the materials in the house." Having accepted and received the donation, "Second Chance either salvaged the appraised materials or consumed them in its deconstruction training program," but that fact did not diminish the value of the donation.

The government contends that the Manns did not donate their entire interest in the property at issue to Second Chance because the transfer of the house was not recorded in the land records, as required by Maryland law to effect a transfer of record ownership. It explains that the house was "never actually severed from the land" and argues that the house therefore was only part of the real property on which it stood. The government also contends that while the donation agreement purported to transfer ownership of the house, the Manns, "in substance, . . . merely donated the right to use the house for specific purposes" — namely, to conduct deconstruction training and salvage. It concludes therefore that the deduction was properly disallowed because the donation consisted of only a partial interest in the house. *See* 26 U.S.C. § 170(f)(3). Finally, the government contends that the $313,353 appraisal "of all the building materials in the house, including

12

those that were not salvaged, was improper," and that Second Chance did not keep records of the items that were salvaged. Thus, the Manns "failed to support their donation with a qualified appraisal, as I.R.C. § 170(f)(11)(C) requires."

Thus, in considering whether the Manns should have been permitted to deduct from their taxable income the value of the house at 5300 Moorland Lane, we must determine whether they donated their entire interest in the house to Second Chance and whether they supported their donation with a "qualified appraisal" of the contributed property.

A

The district court concluded that the Manns did not sever the house from the land, so as to be able to convey their entire interest in the house to Second Chance, because the Manns did not record the transaction in the land records, as required by Maryland law. The Manns argue, however, that "Maryland law has *never* required recordation of an agreement constructively severing an improvement from its underlying land." Rather, they assert, "there need only be a writing sufficient to satisfy the statute of frauds." Thus, they conclude that the agreement with Second Chance both converted the house from real property into personalty and conveyed their entire interest in that personalty to Second Chance.

That argument, however, is not dispositive because while Second Chance may have become the *contractual* owner of the house through the parties' donation agreement, Linda Mann nonetheless retained *record* ownership of the house and, accordingly, remained liable for paying property taxes on the house despite the parties' contract. *See Supervisor of Assessments of Balt. Cnty. v. Greater Balt. Med. Ctr. (GBMC)*, 32 A.3d 174, 180, 184

13

(Md. Ct. Spec. App. 2011); *Townsend Balt. Garage, LLC v. Supervisor of Assessments of Balt. City*, 79 A.3d 960, 967 (Md. Ct. Spec. App. 2013).

Under Maryland law, "real property" includes both land and improvements to land. *See GBMC*, 32 A.3d at 180; *see also* Md. Code Ann. Tax–Prop. § 1-101(gg)(1) (providing, for the purposes of that article, that the term "'[r]eal property' means any land or improvements to land"). The term "improvements" "[g]enerally has reference to buildings, but may also include any permanent structure or other development." *Rose v. Fox Pool Corp.*, 643 A.2d 906, 918 (Md. 1994) (quoting *Black's Law Dictionary* 757 (6th ed. 1990)). Because "improvements affixed to the land are 'considered part of the real property, . . . ownership of the improvements follows title to the land.'" *GBMC*, 32 A.3d at 180 (quoting 41 Am. Jur. 2d Improvements § 3 (2005)).

In *GBMC*, the Maryland Court of Special Appeals concluded that the "owner of real property according to the land records" is also the "record landowner" of "the improvements built thereon" — and thus responsible for paying property taxes with respect to the improvements — unless there is "a recorded deed or other instrument of record showing a transfer of the title to the improvements to another owner." 32 A.3d at 180. At issue there was whether a building and parking garage situated on land owned by a non-profit hospital were also owned by the hospital (and thus eligible for a property tax exemption). *Id.* at 175–76. Pursuant to a leaseback financing arrangement, the hospital had ground leased a vacant parcel of land to "a special purpose [LLC] entity established to facilitate the financing of the improvements" for an initial term of 51 years. *Id.* at 176. The lease provided that the LLC "own[ed] and ha[d] title to the improvements [that would

14

be constructed] during the [lease's] term, subject to the reversion to [the hospital] upon" the lease's expiration. *Id.* at 176–77. But, although the lease and other contracts between the parties indicated that the LLC owned the improvements during lease's term, the court held that the hospital, as the record landowner, owned the improvements for real-property tax purposes because there was no "recorded deed or other instrument of record showing a transfer of the title to the improvements" to the LLC. *Id.* at 180. In reaching this conclusion, the court thus distinguished between *record* ownership and *contractual* ownership, reasoning that "even if contractual ownership of the Improvements was held by [the] LLC," "record title always remained in" the hospital. *Id.* at 184; *accord Townsend*, 79 A.3d at 967 (applying *GBMC* in a factually similar case to hold that buildings constructed by for-profit entities on state-owned land were owned by the State for property tax purposes because there was no recorded document "that transferred record title in the improvements from the owner of the fee simple interest in the land to the for-profit entity").

Under *GBMC* and *Townsend*, it is thus clear that because the transfer to Second Chance of the 5300 Moorland Lane house was never recorded in the public land records, Linda Mann always retained *record* ownership of the house. And this means that during the period between December 1, 2011 (when Linda and Second Chance executed the donation agreement) and the date of the house's demolition in July 2012, Linda was liable for property taxes on both the land and the house. And because Linda retained this aspect of ownership, the Manns neither conveyed their "entire interest in [the] property," 26 U.S.C. § 170(f)(3)(A), nor even "an undivided portion of [their] entire interest in [the] property," as allowed for deduction by § 170(f)(3)(B)(ii).

15

Resisting this conclusion, the Manns argue that *GBMC* and *Townsend* are inapposite because neither case involved Maryland's constructive severance doctrine, which recognizes that while generally "whatever is affixed, or annexed to the soil or freehold becomes a part of it," this "rule of the common law . . . may be modified or changed by the agreement of the parties express or implied." *Walker v. Schindel*, 58 Md. 360, 368 (1882); *see also W. Md. Dairy v. Md. Wrecking & Equip. Co.*, 126 A. 135, 136 (Md. 1924); *Bohle v. Thompson*, 554 A.2d 818, 824 (Md. Ct. Spec. App. 1989) ("[A] person who owns both realty and fixtures upon the realty may effect a constructive severance of the fixtures as personalty in a sales agreement, said agreement being binding on subsequent purchasers of the realty with notice").

It is true that neither *GBMC* nor *Townsend* discussed the constructive severance doctrine. But the Maryland Court of Special Appeals specifically recognized in those cases that "contractual ownership" of an improvement does not, without more, establish "title or record ownership" for real-estate-tax purposes. *GBMC*, 32 A.3d at 184. Thus, even were we to accept that the donation agreement both "constructively severed" the house from the land and conveyed contractual ownership of the house to Second Chance, as the Manns contend, Linda still remained the record owner of the house responsible for real-estate taxes because no document was recorded transferring her ownership of the house to Second Chance.

Even setting aside the consequence of Linda Mann's continuing as the house's record owner, both the donation agreement considered as whole and *the substance* of the transaction demonstrate that Linda failed to transfer her entire interest in the house to Second Chance.

It was clear to the Manns even before Linda signed the donation agreement on December 1, 2011, how the donation would work under Second Chance's procedures. Lawrence explored Second Chance's operations and learned that the charity accepted donations of building materials salvaged from houses "deconstructed" by Second Chance employees as part of a training program and that Second Chance did not "provide demolition services." Indeed, the Manns had already engaged their contractor to demolish the house, and the contractor did so after Second Chance completed the deconstruction. The Manns also understood that "deconstruction" involved the destruction of some of the house's components as necessary to salvage other components and that Second Chance would remove salvageable items to its warehouse for resale. And the remaining components were to be destroyed as part of the training of Second Chance employees or left for demolition.

The Manns thus understood both the nature and scope of Second Chance's operations, and the donation agreement reflected this. The agreement recited how Second Chance "utilizes existing homes . . . to provide building materials for reuse and for work-force training" and how Linda was making the contribution "for the express purpose of Second Chance using the [house] in its charitable operations." In addition, Second Chance

17

promised to "undertake and complete" the deconstruction "in accordance with its *customary procedures*." To this end, Linda donated all her interest in the house but with the limitations expressed. Thus, under the agreement, Second Chance was permitted to take any fixtures and building materials that it wanted, but the parties also clearly contemplated that unsalvaged building components would be destroyed or demolished and that demolition would have to be accomplished by the Manns.

Working under this agreement, Second Chance began the deconstruction on December 22, 2011, removing non-structural interior elements, such as appliances, countertops, and doors, and it completed that phase in January 2012. It then began the second phase of deconstructing exterior and structural elements in June 2012, and completed its work on July 6. Thereafter, the Manns' contractor demolished the remainder of the house and cleared the site. Second Chance's deconstruction was entirely consistent with the scope of work discussed with Lawrence before the donation agreement was signed and consistent with the language of the agreement that Linda signed on December 1.

Thus, in the end, some components of the Manns' house were salvaged by Second Chance for resale; some components were destroyed as part of the deconstruction process; and the remaining components were left by Second Chance for demolition and removal by the Manns' contractor. In these circumstances, Linda's entire interest in the house was not donated to Second Chance, and the value of the house was therefore not deductible under 26 U.S.C. § 170(f)(3).

While the Manns read the donation agreement more narrowly, focusing only on the conveyance language of all of her "right, title and interest" in the house, nonetheless when

18

matters of taxation are involved, "substance rather than form prevails." *W. Va. N. R.R. Co. v. Comm'r*, 282 F.2d 63, 65 (4th Cir. 1960). Thus, "the taxability of a transaction is determined by its true nature rather than by the name which the parties may use in describing it." *Id.*; *see also Comm'r v. Ct. Holding Co.*, 324 U.S. 331, 334 (1945) ("To permit the true nature of the transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress"); *BB&T Corp. v. United States*, 523 F.3d 461, 471, 474 (4th Cir. 2008) (noting that "the doctrine of 'substance over form' recognizes that the substance of a transaction, rather than its form, governs for tax purposes" and that the doctrine thus "serves to prevent taxpayers from manipulating the tax code"). Moreover, "the transaction must be viewed as a whole." *Ct. Holding Co.*, 324 U.S. at 334.; *cf. Volvo Cars of N. Am. v. United States*, 571 F.3d 373, 379 (4th Cir. 2009) (recognizing that "in applying federal law to determine the tax consequences of a transaction defined by state law, we look to the intention of the parties as evidenced by the written agreements *read in light of the attendant facts and circumstances*" (cleaned up)).

Focusing on substance over form, Linda donated some components of the house for salvage, which were in fact removed from the house and taken by Second Chance for resale. And some of the house's components were destroyed onsite, either for work-force training or as necessary to remove salvageable components. But, Linda maintained the benefits and burdens of ownership of the remaining components which she ultimately paid her contractor to demolish. Thus, she did not donate, as personal property, her entire

19

interest in the house to Second Chance, making the Manns' attempt to claim the value of the entire house as a charitable deduction improper.

C

Finally, the $313,353 appraisal used to claim the deduction was not a qualified appraisal of the contributed property under 26 U.S.C. § 170(f)(11)(C). *See* 26 C.F.R. § 1.170A-13(c)(3)(ii)(I). The appraisal assumed that *every component* of the house would be severed and donated to Second Chance for reuse. Based on that assumption about the property contributed and recognizing that many of those components lacked a resale market, the appraisal used a "cost approach to value." The appraiser determined the value of new and uninstalled versions of the building's components and depreciated that value by 17%, a value calculated based on the components having "60-years of economic life with an effective age of 10." The appraiser determined that this represented the components' current value based on the largely unexplained assumption that the 10-year-old materials, now cut to the appropriate size and installed in the house, were worth 83% of their new and uninstalled values. Aggregating the value of each such component — including substantial amounts even for the value of the house's foundation and drywall — the appraisal determined that the value of the entire house was $313,353, and that was the amount that the Manns claimed as a charitable deduction on their amended return.

The district court found this appraisal flawed because not every component was donated to Second Chance, stating that "a valuation of over $300,000 based on the extraction and resale of all building materials does not properly value the donation in light

20

of the conditions placed on the conveyance." *Mann*, 364 F. Supp. 3d at 564; *cf. Rolfs v. Comm'r*, 668 F.3d 888, 895 (7th Cir. 2012) (disallowing deduction based on taxpayers' donation of a house to a local fire department for the house's destruction in a training exercise where "[n]one of the value of the house, as a house, was actually given away"). The court did note that a "proper way" to value the donation would have been "based on the resale value of the specific building materials and contents" that Second Chance removed from the premises. *Mann*, 364 F. Supp. 3d at 564. The appraisal never provided the IRS with an estimate of the value of *those* materials.

In providing a value for every component of the house, the appraisal failed to provide the value of the *contributed* property. *See* 26 U.S.C. § 170(f)(11)(C). This provides another reason why the Manns' claimed deduction was properly denied.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.